# IN THE COURT OF APPEALS OF IOWA

No. 22-1284
Filed January 24, 2024

**RYDER LEE SISCO,**
Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
Respondent-Appellee.
_____

Appeal from the Iowa District Court for Jackson County, Stuart P. Werling,

Judge.

The applicant appeals the denial of his application for postconviction relief.

**AFFIRMED.**

Jennifer Bennett Finn of Pelzer Law Firm, LLC, Estherville, for appellant.

Brenna Bird, Attorney General, and Sheryl Soich, Assistant Attorney

General, for appellee State.

Considered by Tabor, P.J., Chicchelly, J., and Potterfield, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2024).

**POTTERFIELD, Senior Judge.**

After a jury convicted Ryder Sisco of first-degree kidnapping and domestic abuse assault by impeding airflow or blood circulation in 2016, Sisco applied for postconviction relief (PCR), which the district court denied. On appeal, Sisco re-raises some of his claims of ineffective assistance of trial counsel, asserting he was prejudiced by trial counsel's failure to (1) object to testimony from the expert criminalist regarding DNA evidence, (2) challenge the State's proof Sisco removed or confined the complaining witness, and (3) explain the plea offer in a way he could understand.

**I. Background Facts and Proceedings.**

In April 2015, Sisco was charged with first-degree kidnapping and domestic abuse assault by impeding airflow or blood circulation of his live-in girlfriend, D.R. He pled not guilty and, after rejecting a number of plea offers from the State, elected to be tried by a jury.

At the 2016 trial, a neighbor testified that while he was standing outside of his house, he heard a woman screaming for help. When he looked over, a man—Sisco—was forcing a woman—D.R.—into the home; D.R. clung to a wooden pallet in an attempt to withstand Sisco's force, but Sisco was too strong. The neighbor called 911 and, at the request of the dispatcher, stood outside the home to watch for further movement until deputies from the sheriff's office could arrive.

According to D.R., Sisco was mad that she failed to notice he crashed his motorbike while he was driving behind her. Sisco had some road rash and minor injuries, and when D.R. did not immediately comment on them, Sisco told her, "You're a fucking cunt" before forcing her into the home. Once they were inside,

Sisco told her to get undressed and, when she did not comply, he got on top of her as she laid on the ground. He punched and slapped the left side of her face, causing a bruised and swollen lip. Sisco also bit D.R.'s chest through her clothing—ultimately leaving a scar. At some point Sisco stopped, and D.R. got up and bandaged his wounds from the crash. Then Sisco again told D.R. to undress. After she was naked and lying on the bed, Sisco took one of D.R.'s tank tops and wrapped it around her neck, pulling with enough force to prevent D.R. from breathing. Still pulling the tank top around her neck, Sisco verbally berated D.R. as he used his penis to penetrate her anus. D.R. testified, "I just felt tingling in my body. I was just gonna let go. I couldn't take it anymore."

Sisco was stopped by the arrival of the deputies, who knocked and announced themselves multiple times without getting a response. After confirming with the neighbor that Sisco and D.R. were still in the home, the deputies announced their intention to force entry. Only then did Sisco come to the door. The deputies explained they were doing a welfare check on everyone in the home; Sisco would not let the deputies inside, and he continued to block the doorway with his body. D.R. remained in the hallway, nervous, shaking, and worried the deputies would leave. Sisco told the officers he needed to make a phone call, and while he was in the kitchen, D.R. was able to make visual contact with the officers—she pulled down the collar of her shirt to show the bite mark on her chest and mouthed, "Don't leave" and "He bit me." Eventually, D.R. was able to convince Sisco she should step outside and speak to the deputies on the porch. After she was outside, the deputies went in and arrested Sisco.

D.R. was taken to the local hospital and agreed to submit to a sexual assault examination; photographs were taken of her injuries. A number of swabs from the sexual assault exam and the pants Sisco was wearing at the time of his arrest were later tested for DNA.

At trial, the defense and the State introduced competing medical experts. The defense's expert opined that the physical evidence of D.R.'s injuries was not consistent with her claims of being strangled; the expert focused on the fact that the ligature marks on D.R.'s neck were concentrated on the back of her neck—not the front—and what he thought was a general lack of petechial hemorrhages.[1] The defense expert also testified he would expect to see additional and more severe injuries to D.R.'s face if she were hit and punched in the manner she described. The State called an expert in rebuttal, who testified the injuries to D.R. could be consistent with the actions she described.

The jury found Sisco guilty as charged; he was later sentenced to life in prison.

Sisco appealed, claiming the evidence was insufficient to convict him of first-degree kidnapping and trial counsel provided ineffective assistance by failing to object to the jury instructions defining that crime. We affirmed. *See State v. Sisco*, No. 16-1170, 2017 WL 3505294, at *4 (Iowa Ct. App. Aug. 16, 2017).

Sisco filed this PCR action in 2017. After amending his application with the assistance of counsel, Sisco raised a number of claims of ineffective assistance of

---

[1] "Petechia" is "a minute reddish or purplish spot containing blood that appears in skin or mucous membrane as a result of localized hemorrhage." *Petechia*, Merriam-Webster, https://www.merriam-webster.com/dictionary/petechia (last visited Dec. 28, 2023).

trial counsel. Following an evidentiary trial in 2022, the district court denied the application in its entirety.

Sisco appeals.

## II. Standard of Review.

The Sixth Amendment guarantees defendants the right to effective assistance of trial counsel. *State v. Senn*, 882 N.W.2d 1, 16 (Iowa 2016). So when an applicant asserts they received ineffective assistance from trial counsel, their PCR claim is constitutional in nature, and we review de novo. *Lado v. State*, 804 N.W.2d 248, 250 (Iowa 2001).

## III. Discussion.

"[A]ll [PCR] applicants who seek relief as a consequence of ineffective assistance of counsel must establish counsel breached a duty and prejudice resulted." *Castro v. State*, 795 N.W.2d 789, 794 (Iowa 2011). "We start with the presumption that the attorney performed competently and proceed to an individualized fact-based analysis." *Lamasters v. State*, 821 N.W.2d 856, 866 (Iowa 2012). Counsel has not breached their duty when "counsel has made a reasonable decision concerning trial tactics and strategy, even if such judgments ultimately fail." *State v. Ondayog*, 722 N.W.2d 778, 786 (Iowa 2006) (citation omitted). When evaluating whether a decision was reasonable, we put ourselves in the shoes of counsel at the time "the decision was made—during the course of trial." *Id.* at 785. To establish prejudice, the applicant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Martin*, 704 N.W.2d 665, 670 (Iowa 2005) (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). "We

may affirm the district court's rejection of an ineffective-assistance-of-counsel claim if either element is lacking." *Lamasters*, 821 N.W.2d at 866 (citation omitted).

### A. Testimony about DNA.

Scott Stocksleger, a criminalist employed by the Iowa Division of Criminal Investigations (DCI) who specializes in forensic DNA testing, testified on behalf of the State at the underlying criminal trial. Stocksleger was asked about a number of items he tested for DNA, including the pants Sisco was wearing at the time he was arrested and taken to jail. Stocksleger testified that he collected a sample "from within the inner fly or inner crotch" of the pants and found "a mixture of DNA from more than one individual." According to Stocksleger, the "major DNA profile matched" the known profile of D.R. When asked about information on the other DNA contributor, Stocksleger initially testified:

> Right. In evaluating that sample, I was unable to report what the minor contributor's DNA profile because—was because it was just fairly weakened, and that's just part of our procedure if the sample is not sufficiently strong to make that determination, then I can't place that in my report.

The prosecutor followed up with this question, "But in evaluating the data, the raw data itself, it appeared to me that a lot of the DNA factors that were present that were weaker were lining up as being consistent with those of Ryder's known DNA, Ryder Lee Sisco?" And Stocksleger answered, "Yes." Trial counsel did not object. Then, on cross-examination, the following exchange took place between trial counsel and Stocksleger:

> Q. When you testified about the DNA profiles you identified from the crotch of the pajama pants, you said that there was DNA from multiple individuals. A. Correct.
> Q. When [the prosecutor] questioned you, you said that there was a contributor from a single major and a minor contributor. Do

you know how many different contributors there were to the DNA sample from the lining of the pajama pants. A. Right. I do not know for certain. I just know that the major DNA profile that I developed, again, matched that of the known DNA profile of [D.R.], but I could tell there were DNA factors in addition to those.

Q. You mentioned that you looked at the minor profile and you said parts of it were consistent with Mr. Sisco. Is that correct? A. Right. If I did look at those additional factors, he would have been present in those minor contributions to the mixture as well.

. . . .

Q. . . . You said that the minor contributor was consistent with Ryder Sisco. You also said you could not put that in your report. Why couldn't you put that in your report? A. Right. With the DNA report, there's a certain level that those peaks should be at to actually declare this is the minor DNA contributor to this mixture, and those peaks were not at that level where I could just say there was only one minor contributor present, and this is matching or consistent with this individual. Those factors were just insufficient.

Q. Why don't you put in your report that the minor contractor is consistent with Ryder Sisco? A. Again, that's—those peaks were not at a level that was sufficient to make that evaluation.

Q. I guess my question then would be if the data wasn't strong enough for you to put in a report that the minor contributor was consistent with Ryder Sisco, why are you testifying that in your opinion it was consistent with Ryder Sisco? A. Right. Because I was asked if those factors were consistent, and if I look at the data, that's what I would say. I would say they're there. I wouldn't necessarily say that he could be the only person there because they were weak.

Q. Maybe I should reverse the question then. If you can testify that the minor contributor is consistent with Ryder Sisco, why can't you put that in a report in writing? A. Because that's the protocol.

Q. What protocol are you referring to? A. As far as reporting.

Q. Are you saying there's policies within the DCI crime lab about how you do reporting? A. Right.

Q. So under the DCI policy, you should not be saying that Ryder Sisco is consistent with a minor contributor? A. In the report because the peaks were not at a level that I could declare a minor contractor's profile. That's correct.

Q. Is your testimony that Ryder Sisco is consistent with the minor contributor something that would be outside what the protocol for your laboratory directs? A. As far as reporting, I wouldn't—I wasn't able to put that in the report. That's correct.

Q. All right. When you say consistent, can you give us statistical figure, a probability as to whether Ryder Sisco was the minor contributor like you could with, say, [D.R.] would be 1 in 100 billion unrelated random individuals, have you had that. . . . Could you give a probability like you could with someone matching [D.R.'s]

DNA profile? A. I cannot give a statistical probability to that. Again, I didn't put it in the report. This item we can say as far as intimate items when we do report on occasion we can say assuming, you know, because they were the owner of the item, they may be present on an item.

Q. Obviously if the pajama pants belonged to Mr. Sisco and he was wearing them, there would be an obvious explanation to why he would be a contributor to the DNA found on the interior of that item? A. It would seem reasonable that their DNA may be found on that item. Yes.

Sisco maintains trial counsel provided ineffective assistance by failing to object to the prosecutor's question and Stocksleger's answer.

At the PCR trial, trial counsel was asked whether he considered objecting to the prosecutor's question about Sisco's DNA being consistent with that of the minor contributor found in the swab of Sisco's pants. Trial counsel testified he did not object because he did not think the suggestion that Sisco's DNA was found on his own pants was incriminating. Instead, trial counsel used Stocksleger's statement

to attack the witness's credibility in general and point out that he is rendering opinions that are inconsistent with the DCI Lab protocol. It's not that I was afraid of the DNA potential match from Mr. Sisco's pants, that didn't matter at all, but the fact that [Stocksleger was] willing to give opinions that are outside the protocols for his lab suggested his credibility in general on other stuff was—I wanted to attack his credibility on those things indirectly.

We agree with trial counsel; the suggestion that Sisco's DNA was consistent with DNA found on the pants he was known to be wearing at the time of his arrest was not incriminating evidence—that his DNA was on his own clothes was not evidence that supported the State's claim Sisco kidnapped, sexually assaulted, or assaulted D.R. by strangling her. Allowing the jury to hear that suggestion from the criminalist was not likely to adversely affect Sisco, and trial counsel made the

strategic decision to instead use the criminalist's testimony to attack his credibility on cross-examination. This was a reasonable trial strategy, so trial counsel did not breach a duty. *See Ondayog*, 722 N.W.2d at 786.

**B. "Confined or Removed" Element.**

For the jury to find Sisco guilty of first-degree kidnapping, the State had to prove:

> 1. On or about the 15th day of April, 2015, [Sisco] confined [D.R.] or removed [D.R.] from outside to inside the home.
> 2. [Sisco] did so with the specific intent to:
> a. subject [D.R.] to sexual abuse or
> b. inflict serious injury on [D.R.]
> 3. [Sisco] knew he did not have the consent of [D.R.] to do so.
> 4. As a result of the confinement or removal, [D.R.] was sexually abused or suffered serious injury.

As part of his closing argument at the underlying criminal trial, counsel conceded that "[Sisco] pulled [D.R.] into the trailer, no dispute about that. He pulled her in there against her will." Later, when going through the individual elements of first-degree kidnapping, counsel said, "[S]ome of this is not contested. Element 1, on or about the 15th day of April 2015 the defendant confined [D.R.] or removed her from outside to inside the home. That's not contested. He absolutely did it." Sisco claims this strategy amounted to ineffective assistance of counsel.

At the PCR trial, counsel explained that he considered that an uninterested witness—the neighbor—testified that he saw Sisco forcibly pull D.R. into the home and that D.R. had scrape or scratch marks on her wrists from clinging to the pallet while Sisco pulled her. He also considered Sisco's delay in coming to the door when the deputies knocked and that, even after opening the door, he continued to

use his body to block D.R. from speaking with the deputies or exiting the home. Based on this evidence, trial counsel concluded:

> [A]ll of that was supportive of a claim that she had been removed or confined. And I believe that that was a fact beyond change. Meaning no matter what evidence we put up trying to contradict it, the jury would never believe that it wasn't true. I don't see a way a jury thinks that she wasn't removed or confined with the evidence as it was. I can either fight that and lose credibility, or we concede that and fight on other issues where maybe we can make some progress.

Here, trial counsel conceded Sisco removed D.R. from outside to inside the home; he also conceded that Sisco bit D.R. once inside—again matching the physical evidence. Then he used those admissions to argue that while Sisco was guilty of lesser-included crimes of false imprisonment and domestic abuse, he did not sexually abuse, seriously injure, or strangle D.R. (and so was not guilty of the class "A" felony of first-degree kidnapping or the aggravated misdemeanor of domestic abuse assault by impeding airflow or blood circulation). Counsel argued:

> She was probably terrified, humiliated, and she was certainly angry, and that leads us to the second reason we're here because [D.R.] was angry and hurt and upset when she talked to law enforcement. When she talked to the medical providers, she started telling stories about [Sisco] and she accused him of doing things he didn't do. She accused him of doing horrible things that he did not do.

Then, relying on the testimony of his expert and the other physical evidence, counsel argued that D.R.'s claims of sexual abuse and strangulation were not credible.

This strategy was not ultimately successful; the jury found Sisco guilty as charged. But the lack of success does not make a strategy unreasonable. *See Hinkle v. State*, 290 N.W.2d 28, 30 (Iowa 1980) ("The required examination [of counsel's representation] should proceed while resisting, in the light of hindsight,

the temptation to Monday morning quarterback the lawyer in the arena. Nor should the inquiry degenerate into a postmortem, microscopic dissection of each desperate effort of counsel to save a terminal case."). And admitting to some amount of guilt as part of a larger strategy can be a reasonable decision that falls within the range of normal competency. *See, e.g.*, *Pettes v. State*, 418 N.W.2d 53, 56 (Iowa 1988) (ruling counsel's conduct fell within the range of normal competency when counsel "testified that his statement to the jury about [the defendant] being guilty of 'something' was necessary to maintain credibility with the jury" because the defendant had "severely beaten his wife with a gun in the presence of several witnesses, and it would be difficult to convince a jury that there was not a crime in there somewhere. [Counsel] testified he was hoping to persuade the jury that a lesser included offense would be appropriate under the circumstances"); *Brown v. State*, No. 14-1646, 2016 WL 351459, at *3–10 (Iowa Ct. App. Jan. 27, 2016) (finding no breach of duty where counsel admitted defendant was guilty of some lesser-included crimes as part of trial strategy to gain acquittal on charge of first-degree kidnapping).

Trial counsel made a reasonable strategic decision to admit to the lesser-included crimes for which there was overwhelming evidence as part of a strategy to defend against the more serious crimes. We find no breach of duty, so this claim fails.

**C. Plea Offer.**

Sisco claims trial counsel provided ineffective assistance by failing to explain the State's plea-agreement offers in a way he could understand. To establish prejudice in this context, Sisco "must show that, but for counsel's advice,

he would have accepted the plea." *Kirchner v. State*, 756 N.W.2d 202, 205 (Iowa 2008) (citation omitted). "The applicant 'must present some credible, non-conclusory evidence that he would have pled guilty had he been properly advised.'" *Id.* (citation omitted).

Here, Sisco had only his own testimony that he would have accepted a plea deal—after he was already convicted of kidnapping and sentenced to life in prison—to establish that he would have accepted the State's plea offer, which included pleading guilty to a sexual-abuse crime (and would require him to register as a sex offender), but involved a maximum prison sentence of twenty-five years. This is not enough to prove that, but-for counsel's alleged errors, Sisco would have accepted the plea. *See Dempsey v. State*, 860 N.W.2d 860, 869 (Iowa 2015) ("In establishing a reasonable probability a claimant would have accepted the earlier plea offer had he or she received effective assistance of counsel, a claimant must proffer more than his or her own subjective, self-serving testimony."). And we think this conclusion is buttressed by the fact that at his PCR trial, when he was asked whether he wanted "the court to either reinstate [his] final plea offer or to give [him] a new trial," Sisco testified unequivocally that what he wanted was a new trial.

Because Sisco has not established that he would have accepted the State's offered plea agreement if it was explained to him differently, he failed to prove prejudice. This claim fails.

**IV. Conclusion.**

Sisco failed to establish any of his claims of ineffective assistance of trial counsel. We affirm the district court's denial of his application for PCR.

**AFFIRMED.**